Judge Rosemary Ledet
This is a zoning case. The plaintiff, Edward Trent Robinson, applied for a permit *793 to operate a social club. Both the Director of the Department of Safety and Permits, Jared Munster, Ph. D (the "Director"), and the New Orleans Board of Zoning Adjustments (the "BZA") denied Mr. Robinson's request for a permit, finding the proposed use did not meet the definition of a social club under the Comprehensive Zoning Ordinance for the City of New Orleans ("CZO"). On Mr. Robinson's appeal, the trial court reversed. From the trial court's judgment, the City of New Orleans (the "City"), the Director, and the BZA (collectively, the "Appellants") appeal to this court. For the reasons that follow, we reverse the trial court's judgment.
FACTUAL AND PROCEDURAL BACKGROUND
This dispute arises out of Mr. Robinson's application to operate a social club to promote various cultural aspects of the City-the Mardi Gras Indians, art, food, and music. Before applying for the permit, Mr. Robinson registered the social club-the Crescent City Connection Gris-Gris Pleasure Aide and Social Club ("Crescent City")-with the Louisiana Secretary of State as a non-profit corporation. Crescent City is a tax-exempt entity; and Mr. Robinson is its president. Crescent City will be open to anyone who pays the membership fee; Mr. Robinson initially set the membership fee at $1,377 per year, coinciding with the street address for the selected venue. The selected venue for the social club is an old, former firehouse located at 1377 Annunciation Street in New Orleans, Louisiana (the "Property"). Mr. Robinson leased the Property from Tim Bonura/TMF Hotel Properties.[1]
Under the CZO, the Property is located in the Historic Urban Neighborhood Business District ("HU-B1A") zoning district.[2] In the HU-B1A zoning district, a social club is a permissible use; a live performance venue is not. See Section 12.2.A (Table 12-1) of CZO. A social club and a live performance venue are defined in Section 26.6 of the CZO as follows:
Social club or lodge. Structures operated by an organization or association for some common purpose, such as, but not limited to, a fraternal, social, educational, or recreational purpose or a union hall, but not including clubs organized primarily for profit or to render a service which is customarily earned on as a business. Such organizations and associations shall be incorporated under the laws of Louisiana as a nonprofit corporation or registered with the Secretary of State of Louisiana. Fraternities/sororities are not considered social clubs or lodges
Live performance venue . An indoor facility for the presentation of live performances, including musical acts, theatrical plays or acts, stand-up comedy, magic, dance clubs, and disc jockey performances *794 using vinyl records, compact discs, computers, or digital music players. A live performance venue is only open to the public when a live performance is scheduled. Unless otherwise restricted by this Ordinance, a live performance venue may serve alcoholic beverages as an ancillary use but only when the venue is open to the public for the live performance. A live performance venue does not include any adult uses.
Classifying Mr. Robinson's proposal as a "Live Performance Venue/Bar," the Director denied Mr. Robinson's permit application. In his February 23, 2017 Letter of Determination, the Director gave the following reasons for his decision:
The proposal, as it is understood by the Department, contemplates a members-only social club which will operate a restaurant offering breakfast, lunch, and dinner meal service with live entertainment during lunch and dinner with additional music performances after dinner service on a nightly basis.
Upon evaluating the proposal and upon further clarification of the proposed operating parameters, the Department ... has maintained its initial determination that this proposal constitutes a Live Performance Venue/Bar, which is not a permissible use in the HU-B1A, Historic Urban Neighborhood Business District.
While we appreciate that the entity that will be operating the establishment is a non-profit social club for the benefit of its membership, the Department is bound by the language of the Comprehensive Zoning Ordinance in making this determination .... It is true that your proposal makes a distinction between being "open to the public" and being restricted to members only; however, the Department cannot differentiate between the availability of walk-up one-day-membership deposit entry and the sale of tickets for a performance.
Additionally, the definition of Social Club or Lodge ... "[excludes] clubs organized primarily for profit or to render a service which is customarily carried on as a business." As the uses contemplated within the social club are services customarily carried on as a business, the Department must analyze the proposal as that business type. Unfortunately a Live Performance Venue is not a Permitted Use within the HU-B1A Zoning district.
The Director further noted that the operating parameters set forth in Section 20.3 CCC of the CZA[3] "are supplemental to the definitional standards provided in Article 26" and that "one must first look to the definitional requirements to determine the proper classification of the proposed use."[4]
On April 10, 2017, Mr. Robinson appealed the Director's decision to the BZA. As part of his appeal, his attorney sent a *795 letter to the BZA. Arguing Crescent City was in compliance with all the pertinent provisions of the CZO regarding the definition and use standards for a social club, his attorney stated the following:
• Crescent City is a [Section] 501(c)(7) [of the Internal Revenue Code] that is registered as a non-profit corporation with the Louisiana Secretary of State as such.
• Crescent City is seeking a permit to operate as a social club for a common purpose of promoting New Orleans arts, music, and culture.[5]
• Crescent City is seeking to operate the social club at 1377 Annunciation, and not more than 50% of the floor space at that location will be used for office space.
• Crescent City anticipates serving food and beverages only to its members. It is anticipated that culinary instruction and training would be an aspect of the use of the space.
• Crescent City will comply with all laws and regulations related to lease of the space for any receptions.
Mr. Robinson's attorney also stated that the proposed business was not a live performance venue, as the Director found, for two reasons: "(1) the social club would not be open to the public and (2) the social club would not be open only during live performances."
On June 5, 2017, two representatives of the neighborhood sent emails to the BZA voicing their opposition to Mr. Robinson's proposed venture. First, Julie Simpson, the president of Coliseum Square Association, stated in her email that "the greater portion of [Mr. Robinson's] venture, evidenced by the large floor space taken up with a stage and viewing area for the stage, gave neighbors great pause in supporting the music component of his project." She further stated that "nightly live music was a very real part of this club." She observed that the building, which has no real sound deadening equipment, is very large with vintage windows and surrounded by residential properties on all sides.
The second email was from Louis J. Volz, III, a former president of Coliseum Square Association and a former City Planning Commission member. In his email, Mr. Volz stated that an attempt to have a social club that functions more as a live music and entertainment venue is inconsistent with the CZO and that "[t]he proximity of the proposed facility to residential components would be injurious to the residents of the neighborhood." He also stated that the "[m]ere use of a name that includes the term 'social club' is hardly dispositive of actual use and intent."
In an email exchange dated May 15, 2017, Mr. Robinson requested that the statement regarding his appeal on the BZA's agenda be clarified. Regarding Mr. Robinson's appeal, the BZA's agenda stated as follows:
Denial of permit (application number 17-02463-RNVN) to operate as a members only social club, which will serve meals and offer live entertainment during lunch and dinner service. The definition of "social club" prohibits operations for profit or to render a service customarily carried on by a business. The Director asserts live musical performances in a social club constitute activities customarily carried on by a business.
*796 In his email, Mr. Robinson asserted that the BZA's agenda was "inaccurate, as Director Munster has officially recognized our intended occupancy as Social Club or Lodge as per city code [CZO Article] 20.3.CCC; however, yet [he] did not recognize the right to have live entertainment for our membership which is what we are seeking to appeal before the board."[6]
In response, the Director, on the same date, wrote:
The request as state[d] on the agenda is correct. The question at issue is whether the use as it was proposed is properly classified as a social club or something different. You have changed the operating parameters since that time to bring it within what is allowable as a social club per this Department's standards.[7]
Mr. Robinson replied: "[t]o be clear, we will [be] appealing our right as a 20.3.CCC to live entertainment before the BZA correct?" The City Planner replied:
You are technically appealing the determination of the Director of the Department of Safety & Permits pertaining to the letter dated February 23, "1377 Annunciation St.-permit application 17-02463-RNVN.["]
In reading that letter, the appeal will be focused around Article 26's definition of Social Club or Lodge. As Dr. Munster mentions below, "... whether the use as it was proposed is properly classified as a social club or something different."
At the June 12, 2017 BZA hearing, multiple witnesses testified, including Mr. Robinson, his attorney, the Director, and representatives of the neighborhood. The neighborhood representatives echoed the views expressed in Ms. Simpson's and Mr. Volz's emails; the gist of their testimony was that the proposed use of the Property was not as a social club, but rather as a live performance venue or nightclub. Mr. Robinson's attorney repeated the arguments set forth in her letter to the BZA. His attorney also emphasized that, in response to the Director's concerns, Mr. Robinson had removed the daily membership option from his proposed use of the Property. The Director replied that he had reservations about Mr. Robinson amending his business proposal "on the fly" and that the substance of his opinion would not change based on Mr. Robinson's revisions. He opined that "this is a live entertainment *797 venue regardless of whether that membership has to be paid at the door, all $1,300 of it, or can be broken down across months or days."
Ultimately, the dispositive issue before the BZA was whether the Director correctly classified the proposal as a "Live Performance Venue/Bar." Addressing the classification issue, the Director testified that it is the role of the Department of Safety and Permits to make sure that a proposed use coincides with the use and definition standards in the CZO. The Director explained that "if it acts like a business, we have to treat it like the business it acts like." The Director determined that Mr. Robinson's proposed venture acts more like a live performance venue than a social club. Given that a live performance venue is not allowed in the HU-B1A zoning district, the Director requested that the BZA uphold his denial of the permit. The BZA voted three-to-one to deny the appeal.[8]
On July 12, 2017, Mr. Robinson filed a "Verified Petition for Writ of Review," pursuant to Article 4.8(B) of the CZO and La. R.S. 33:4727(E)(1),[9] in the trial court, naming Appellants as defendants. In his petition, Mr. Robinson averred that the Director's decision "looks beyond the fact that a social club is a permitted use in the zoning district." He averred that the Director denied his permit on the following two grounds:
(1) Mr. Robinson was seeking to establish a Live Performance Venue, which is not permitted in the HU-BIA zoning district[;] and
(2) the music and Mardi Gras Indian workshops would constitute live performances that are services customarily carried on as a business.
Mr. Robinson further averred that the BZA's decision is "not supported by the express language of the CZO, and the decision is, without question, arbitrary, unreasonable, and capricious considering the inconsistent application of the definition of 'social club.' " He still further averred that the definition of social club, as set forth in the CZO, is being applied differently to persons similarly situated, violating his right to equal protection.
On November 7, 2017, the trial court found the BZA's decision to uphold the Director's denial of the permit was arbitrary and capricious and, thus, reversed the decision. The trial court provided the following reasons for judgment:
Initially, the court notes that Mr. Robinson requested a permit to operate a social club. The club will be used by the Wild Magnolias[-a Mardi Gras Indian group-]as their home base to store and sew their suits and there will be live music on occasion. And, when [D]efendants voiced concerns that allowing a daily membership fee for members would appear to be a live performance venue rather than a social club, Mr. Robinson revised his business model to delete the daily membership fees as an option.
*798 The court finds that this proposed social club meets the definition of a social club as it is incorporated under the laws of Louisiana and is registered with the Louisiana Secretary of State ....
While the BZA maintains that the proposed social club is actually a live music venue, in Flex Enterprises, Inc. v. the City of New Orleans , [00-0815 (La. App. 4 Cir. 2/14/01),] 780 So.2d 1145... the court held that when property is zoned to allow a specific type of establishment, AND the proposed establishment meets the zoning requirements, the BZA is arbitrary and capricious if it denies the permit simply because [the BZA] believes that the property will actually be used for an improper or illegal purpose.
In the case at bar, because the evidence reflects that Mr. Robinson applied to operate a social club, the proposed establishment meets the definition of a social club as provided in the CZO, and social clubs are permitted in HU-B1A zoning districts, the court finds that the BZA was arbitrary and capricious in denying Mr. Robinson's request for a permit to operate a social club at 1377 Annunciation Street.
This appeal followed.
STANDARD OF REVIEW
Summarizing the standard for reviewing decisions of the BZA, this court, in Ellsworth v. City of New Orleans, stated as follows:
The jurisprudence has recognized that "the decisions of the BZA, while subject to judicial review under La. R.S. 33:4727(e), are subject to a presumption of validity and are subject to judicial review only as to whether they are arbitrary, capricious or an abuse of discretion." The jurisprudence has further recognized that "[t]he reviewing court may not simply substitute its own judgment for that of the BZA." The jurisprudence has still further recognized that it " 'is not within the province of the appellate court to second guess a zoning decision that appears to have been based on appropriate and well-founded concerns for the public.' "
13-0084, pp. 6-7 (La. App. 4 Cir. 7/31/13), 120 So.3d 897, 902 (internal citations omitted).
In this context, we review the BZA's, not the district court's, decision. In re Aggrieved Practitioner , 17-0298, pp. 17-18 (La. App. 4 Cir. 11/15/17), 231 So.3d 761, 771, writ denied , 17-2085 (La. 2/9/18), 236 So.3d 1267 (observing that "an appellate court sitting in review of an administrative agency reviews the findings and ultimate decision of the administrative agency and not the decision of the district court"). "When reviewing an administrative final decision in an adjudication proceeding, the district court functions as an appellate court." Bourgeois v. Louisiana State Racing Comm'n , 10-0573 (La. App. 4 Cir. 11/12/10), 51 So.3d 851, 856 (quoting Smith v. State, Dep't of Health and Hospitals , 39,368, p. 7 (La. App. 2 Cir. 03/02/05), 895 So.2d 735, 739 ). For this reason, " '[w]hen an appellate court reviews the district court's judgment, no deference is owed by the appellate court to the district court's fact findings or legal conclusions, just as no deference is owed by the Louisiana Supreme Court to factual findings or legal conclusions of the court of appeal.' " Aggrieved Practitioner , 17-0298 at p. 17, N. 12, 231 So.3d at 771 (quoting Bourgeois , supra (quoting Smith , supra ) ).
DISCUSSION
The principal issue presented in this appeal is whether the BZA's decision to uphold the Director's denial of Mr. Robinson's permit application was arbitrary and *799 capricious. Resolution of this issue turns on the distinction between the use of the Property as a social club-the label Mr. Robinson places on it and a permissible use in the HU-B1A zoning district-and a live performance venue-the label the Director places on it and a prohibited use in that zoning district.
Appellants contend that the Director, when classifying the proposed use of the Property, reviewed Mr. Robinson's application based upon how the proposed venture would actually function. The Director, they contend, acted appropriately when he determined that the proposed venture, overall, is more akin to a live performance venue than a social club. They further contend that the Director and the BZA are vested with the discretion to make that type of determination, particularly when, as here, the unenumerated use-a live performance venue-is specifically excluded in the CZO from the underlying zoning district.
Appellants also contend that despite the "social club" label that Mr. Robinson places on his proposed venture and "despite that social clubs may have incidental live performances where the underlying zoning allows ," an organization that "render[s] a service which is customarily carried on as a business" is not a social club under Section 26.6 of the CZO. Appellants emphasize that Mr. Robinson proposes to have regular live music performances on the Property and that this is a service customarily carried on by a business. Appellants point out that "although live music is not prohibited as a use in a social club, it is also not an enumerated use by right." Appellants also point out that the BZA had the opportunity to agree with Mr. Robinson that live entertainment is inherently allowed in a social club, but it declined to do so. Based on the evidence presented, Appellants contend that the BZA's decision is neither arbitrary nor capricious.
Mr. Robinson counters that, in this case, Appellants are seeking to impose an additional restriction on a social club that is not included in the definition of that term in the CZO-that "a social club cannot have a purpose or carry on any activity that would otherwise be prohibited in the zoning district." The additional limitation that he contends Appellants are seeking to impose is that a social club cannot have live entertainment if it is not permitted in the zoning district. Citing Flex Enterprises , supra , Mr. Robinson contends that "if live entertainment seems inconsistent with the permitted use of a social club, such a prohibition of live entertainment must be clearly set forth in the CZO and not imposed on a case-by-case basis." Moreover, he contends that Appellants are seeking to apply the definition of social club differently depending on the location of the social club. He argues that, during the BZA hearing, other social clubs were discussed that are permitted to have live entertainment, establishing an equal protection violation. He, thus, contends that the BZA's decision to uphold the Director's decision, as the trial court found, was arbitrary and capricious.
We find the trial court erred in reversing the decision of the BZA for the following two reasons: (i) the BZA's decision is consistent with the CZO, which expressly restricts the use of property as a live entertainment venue; and (ii) the Flex Enterprises case, on which the trial court relies, is distinguishable. We separately address each reason.
CZO regulations on the use of property as a live entertainment venue
Three of the generic uses of property *800 identified in the CZO[10] are pertinent to the instant dispute-"Social club or lodge"; "Live performance venue"; and "Live entertainment-secondary use." The CZO definitions of the first two generic uses are set forth elsewhere in this opinion; the CZO definition of "Live entertainment-secondary use" is set forth below:
Live entertainment-secondary use. Any one (1) or more of any of the following live performances, performed live by one (1) or more persons, whether or not done for compensation and whether or not admission is charged: musical act, theatrical play or act, including stand-up comedy, magic, dance clubs, and disc jockey performances using vinyl records, compact discs, computers, or digital music players when the disc jockey is in verbal communication with the clientele of the establishment. Live entertainment-secondary use shall be part of a standard restaurant, specialty restaurant, indoor amusement facility or bar, and shall be approved separately. A standard restaurant, specialty restaurant, indoor amusement facility, or bar may be open to the public when no live performances are scheduled. Live entertainment-secondary use does not include:
A. Any such activity performed for the practice or private enjoyment of the residents of a dwelling and their guests.
B. Any adult uses.
C. Periodic entertainment at educational facilities or places of worship, performances at cultural facilities, performances at reception facilities, performances at weddings or similar religious events, the playing of recorded music over speakers without a disc jockey, poetry readings, or spoken word performances.
D. Musical accompaniment for patrons at a restaurant (standard or specialty), in conformance with [enumerated use standards].[11]
Article 26.6 of the CZO.
The usage requirements for both "Live performance venue," and "Live entertainment-secondary *801 use" are provided for in Section 20.3 JJ of the CZO as follows:
1. Live entertainment-secondary use is considered a separate principal use. Live entertainment-secondary use may only be established when allowed within a zoning district and in conjunction with a bar, standard restaurant, or indoor amusement facility.
2. Live entertainment-secondary use and live performance venues shall submit a noise abatement plan, to be reviewed by the Director of Safety and Permits, and all other appropriate City agencies, which shall address the intended use of amplification, noise levels, and need for soundproofing. Outdoor live entertainment areas located within thirty (30) feet of a residential district shall be a conditional use.
3. Live entertainment-secondary use and live performance venues shall submit a security and operation plan, with the following added:
a. For Live entertainment-secondary use, the days and hours of operation for the establishment's general operations as a standard restaurant or bar, and the days and hours of operation for the live entertainment component.
b. The configuration of the live entertainment area within the establishment.
c. Loading areas.
d. All Live entertainment-secondary use and live performance shall provide exterior security cameras.
4. Live entertainment-secondary use and live performance venues shall submit a summary of the number and location of places of worship, educational facilities, and parks and playgrounds within three-hundred (300) feet of the proposed location.
5. Windows and doors shall be closed during live entertainment performances and compliance with the City of New Orleans Noise Ordinance is required. In the Vieux Carré Districts, music of any kind is prohibited outside the building, unless authorized through the conditional use process.
6. If the live entertainment-secondary use and live performance venues use plans an increase in intensity, such as an expansion of floor area, increase in live performance area or increase in permitted occupancy, a security and operation plan shall be updated and resubmitted for approval. Revised security and operation plans shall be approved prior to the issuance of any permits.
*802 7. Security and operation plans may be revised by the property owner or person authorized in writing by the owner. New plans shall be resubmitted for approval.
8. Because live entertainment-secondary use is only allowed with a bar, standard restaurant, or indoor amusement facility, when the submittal requirements of live entertainment-secondary use and standard restaurant or bar are duplicated, only one (1) set of submittal requirements is required to be submitted and updated.
As the above provisions reflect, the CZO regulates the use of property as a live entertainment venue in two ways: (i) as a primary use-a Live entertainment venue; and (ii) as a secondary use-a Live entertainment-secondary use. In the HU-B1A zoning district in which the Property is located, neither type of live entertainment venue is permitted. See Section 12.2.A (Table 12-1) of CZO.[12]
The CZO also expressly excludes certain categories of performances from the live entertainment use category. The exclusions are enumerated in the definition of "Live entertainment-secondary use," quoted elsewhere in this opinion. The exclusions include adult uses, which are regulated elsewhere in the CZO; uses that are part of the general character of the property-"periodic entertainment at educational facilities or places of worship, performances at cultural facilities,[13] performances at reception facilities,[14] *803 performances at weddings or similar religious events, the playing of recorded music over speakers without a disc jockey, poetry readings, or spoken word performances"-and "[a]ny such activity performed for the practice or private enjoyment of the residents of a dwelling and their guests." Article 26.6 of the CZO. The exclusions from the live entertainment use category do not include performances at a "Social club or lodge."
Given that neither type of live entertainment venue-"Live entertainment venue" or "Live entertainment-secondary use"-is permitted in the HU-B1A zoning district in which the Property is located coupled with the lack of an exclusion of live entertainment performances at a "Social club or lodge" from the live entertainment use category, the BZA's denial of Mr. Robinson's appeal is consistent with the CZO.
The Flex Enterprise s case is distinguishable
The trial court, in reversing the BZA, relied on the Flex Enterprises case. The trial court's reliance on that case is misplaced. In Flex Enterprises , the then-Director of Safety and Permits, Paul May, denied the plaintiff's request for a permit to operate a health club in the CBD-7 zoning district. Director May's reason for doing so included that the layout of the proposed business-the percentage of space dedicated to exercise equipment and the large number of little cubicles (fifty-two)-was inconsistent with a typical, bona fide health club. At the BZA hearing, a citizen testified that the proposed business was a "gay bathhouse," which he said was "clearly a spa as defined by our zoning ordinances." The BZA upheld Director May's decision to deny the permit, and the trial court found no evidence that the BZA acted arbitrarily or capriciously.
Reversing, this court in Flex Enterprises reasoned that Director May and the BZA were "seeking to impose additional requirements that are not expressed in the zoning ordinance, as well as limitations that are not expressed therein." Id. , 00-0815 at p. 11, 780 So.2d at 1152. Continuing, we stated as follows:
Whatever the true nature of the proposed establishment, the fact is that the record evidence indicates that the establishment qualifies as a "health club" under the New Orleans CZO, as it now reads .... If certain establishments are to be prohibited in an area either because they include certain items that seem inconsistent to zoning officials with the permitted uses of the zoning classification or because a certain percentage of the establishment is not devoted to a particular purpose, such rules must be clearly set forth in the official zoning ordinance, not imposed on a case-by-case basis.
*804 Id. , 00-0815 at pp. 10-11, 780 So.2d at 1151-52. We thus concluded that the decisions of the BZA and Director May were arbitrary and capricious.
This case, as Appellants point out, is distinguishable from Flex Enterprises in the following three respects:
i. The Director's denial is based on the activities that Mr. Robinson actually proposes (regular live music performances) rather than a speculative fear of illegal or improper uses;
ii. Mr. Robinson's proposal includes uses not enumerated under the definition of a "social club"; and
iii. The use the Director identified is not allowed in the zoning district in which the Property is located.
Because an analysis of these three distinguishing factors is instructive in resolving the issue presented here, we separately address each factor.
Speculative fear of illegal or improper use
In Flex Enterprises , we held that the BZA could not base its denial of a permit on the legality or propriety of potential future activities at the proposed establishment. Thus, we found it was inappropriate to consider the suggestion, made by a member of the public, that the property would be used improperly as a "gay bathhouse." We reasoned that "[t]his appeal involves a zoning issue, not issues related to the legality or propriety of the activities to be conducted in the proposed establishment." Id. , 00-0815 at p. 10, 780 So.2d at 1151.
Here, in contrast, the Director denied the permit based on the use of the Property that Mr. Robinson actually proposed-regular live music performances. Indeed, the BZA application for Mr. Robinson's appeal states: "denial of permit ... to operate as a members only social club, which will serve meals and offer live entertainment during lunch and dinner service." In his email exchange dated May 15, 2017, Mr. Robinson stated that he was appealing Crescent City's "right as a [Section] 20.3.CCC to live entertainment."[15] Moreover, at the BZA hearing, Mr. Robinson testified regarding the expanded live music performances he planned for weekends, stating that "Friday and Saturday nights were the nights we were considering having live entertainment that's outside of the traditional use of the club" and having "featured guests such as a Dr. John or someone larger" than the music performance area typically could accommodate. As Appellants point out, no one questions the general legality of live music entertainment in a venue in which it is permitted; however, in the HU-B1A zoning district in which the Property is located, live entertainment is not an enumerated permissible use.
Enumerated permissible uses
In Flex Enterprises , a citizen testified before the BZA (and presented an amicus brief in this court) that the proposed health club was actually a spa. This court observed that even if the club was in fact to be used as a spa, "a 'spa' is specifically classified as a 'health club' under the CZO definition, meaning that a 'spa' is a permitted *805 use of property zoned CBD-7." Id. , 00-0815 at p. 10, 780 So.2d at 1151. Here, in contrast, the provision of live entertainment (music) is not an enumerated use within the definition of social club; and a live performance (entertainment) venue is not a permitted use in the HU-B1A zoning district. Appellants point out that Mr. Robinson seeks to provide "a steady stream of live music performances at the proposed establishment." Hence, the denial of the permit, as Appellants point out, was "based on a predominant use that is not enumerated by right."
Language of the CZO
In Flex Enterprises , Director May failed to apply the language of the CZO to the plaintiff's proposal to operate a health club. The CZO required that the space be a minimum of 4,000 square feet (the space in question was 11,000 square feet) and that it contain exercise equipment. The CZO specifically allowed services including spas and hot tubs. We reasoned that Director May's stated reasons for denying the permit-the percentage of space dedicated to exercise equipment and the large number of cubicles-addressed "issues entirely outside the definition of 'health club' in the CZO." Id. , 00-0815 at p. 9, 780 So.2d at 1151. We further reasoned that "the definition in the CZO does not exclude any types of spaces because they are inappropriate for 'health clubs.' " Id.
Here, in contrast, the Director's decision was based on an application of the definition of social club in the CZO, which excludes organizations "render[ing] a service which is customarily carried on as a business." Section 26.6 of the CZO. The Director examined Mr. Robinson's proposed venture and determined that it would provide regular live music performances-a service customarily carried on as a business. For this reason, the Director found that the proposed use is not a social club pursuant to the CZO. Upon categorizing the proposal as a live performance venue, the Director determined that it is not permitted in the zoning district and denied the application.
Recapping, contrary to Mr. Robinson's suggestion and unlike in Flex Enterprises , Appellants did not impose additional requirements or limitations not contained in the CZO when they denied the application for a permit to use the Property as a social club. The application was denied simply because Mr. Robinson's proposed use of the Property does not comply with the requirements for a social club in the CZO. Stated otherwise, his proposed use of the Property does not satisfy the definition of a social club because the exclusion for organizations "render[ing] a service which is customarily carried on as a business" applies.
The purpose of the exclusion is "to protect the traditional activities of private clubs, so long as they were confined to the use of members only and not made available to the public generally." City of Baltimore v. Poe , 224 Md. 428, 432, 168 A.2d 193, 195 (1961).[16] Despite Mr. Robinson's deletion of the daily membership option, the Director testified before the BZA that, as proposed, the project will not be open exclusively to members. The Director emphasized that Mr. Robinson conceded additional family members and guests of members will be allowed to attend live music performances.
*806 Regardless, contrary to Mr. Robinson's suggestion and consistent with the Director's position, any and all uses of a property are not permitted simply because such uses are conducted by a social club in a zoning district that permits social clubs; rather, the entire spectrum of zoning requirements applicable to the use of property must be considered. Voicing this view, the Director testified before the BZA as follows:
There are different elements that can fit into a single use, but we have to look at across the spectrum of what is allowable in that zoning district in making the determination. So it's not simply a matter of can a social club have live entertainment? It's a matter of can live entertainment be conducted in that zoning district?
Hosting regular live performances is not a permitted use in the HU-B1A zoning district in which the Property is located. Thus, the BZA's decision upholding the Director's decision was not arbitrary and capricious.
Mr. Robinson's suggestion that Appellants violated the equal protection clause by denying his permit application is unpersuasive. As Appellants point out, Mr. Robinson was not treated differently than other similarly situated organizations with the same zoning district or classification. See Beauclaire v. Greenhouse , 05-0765, p. 5 (La. 2/22/06), 922 So.2d 501, 505 (observing that "[t]he law merely requires equal application in similar circumstances"). At the hearing, the Director explained that if there are other social clubs in the City that are allowed to host live music performances, "it is because they are in different zoning districts that permit live performance venues or [have uses that were grandfathered in under an older zoning regime]." Mr. Robinson's equal protection argument is unpersuasive.
Lastly, Appellants assert that the trial court erred by not assessing the costs of this administrative appeal to Mr. Robinson under La. R.S. 33:4727(E)(5), which provides as follows:
The court may reverse or confirm, wholly or in part, or may modify the decision brought up for review. Costs shall not be allowed against the board unless it appears to the court that it acted with gross negligence, in bad faith, or with malice in making the decision appealed from. All issues in any proceedings under this Section shall have preference over all other civil actions and proceedings.
Because the statute focuses on the trial court's ability to impose costs on the Director, we find Appellees' request that we assess costs on Mr. Robinson based on the statute unpersuasive and decline to impose costs on him.
DECREE
For the foregoing reasons, the judgment of the trial court is reversed.
REVERSED

Mr. Robinson points out, in his brief, that the Property actually occupies three municipal addresses-1377 Annunciation Street, 1379 Annunciation Street, and 907 Terpischore Street. For this reason, he states he applied for three permits. The BZA and the trial court refer only to the application for 1377 Annunciation Street.

As set forth in Section 12.1A of the CZO, the stated purpose of the HU-B1A zoning district is as follows:
The HU-B1A Neighborhood Business District is intended to address an individual parcel or small cluster of parcels in non-residential use that exist within residential areas that have historically served the neighborhood and are located on a corner, including established corner stores. These historic neighborhood business uses are consistent with the character of the surrounding neighborhood and are intended to serve the immediate area with minimal impact on the surrounding residential uses.

Section 20.3 CCC of the CZO imposes the following use standards for a social club or lodge:
1. No more than fifty percent (50%) of the gross floor area may be used as office space for the social club or lodge.
2. Social clubs and lodges are permitted to serve meals and alcoholic beverages on the premises for members only.
3. Sleeping facilities are prohibited.
4. Social clubs and lodges leased or used as reception halls shall comply with the requirements for reception halls of this Article.

The Director also instructed Mr. Robinson that he could seek a text amendment to the CZO or a map amendment to rezone the Property to a district that allows live music performances, both of which would require review by the City Planning Commission and approval by the City Council.

Mr. Robinson's attorney further pointed out that "other benefits would be offered to members, including music performances, performances by Mardi Gras Indians, workshops related to Mardi Gras Indian culture and costuming, music workshops, visual art displays and presentations, and the placement of a community garden at the site."

On May 10, 2017, Mr. Robinson held a Neighborhood Participation Program ("NPP") meeting. In the notice scheduling the NPP meeting, he stated that "[t]he site is located in an HU-B1A Neighborhood Business District, where a Social Club or Lodge (20.3CCC) is a Permissible Use ...; however, as such the right to live-entertainment for our membership's enjoyment has been challenged which means we are required to apply for approval [to the BZA]." On June 5, 2017, Mr. Robinson's counsel, in a supplemental letter to the BZA, noted that the neighbors' concerns expressed at the NPP meeting included the use of the Property as an apparent live entertainment venue and the resulting noise.

In their brief to this court, Appellants point out that "[b]etween filing his appeal [to the BZA] and the BZA hearing, Appellee [Mr. Robinson] agreed to a stipulation that no live entertainment will occur at the facility without a correlating Special Event permit, which allows live entertainment at discrete, specific events. The Director also issued a Special Event permit to allow certain performances at the location while the matter was being appealed." At the BZA hearing, Mr. Muster explained that Mr. Robinson would be eligible for a total of twelve Special Event permits per year and that each permit could be issued for up to three days. Theoretically, he could obtain thirty-six days of Special Event permits. At oral argument before this court, Appellants' counsel confirmed that Mr. Robinson was issued a permit to operate as a social club; however, in the event he wishes to have live music, he must apply for a Special Event permit.

The Notice of Disposition states that "[t]he appeal shall be disallowed as the concurring vote for four (4) members of the Board was not attained. Thus, the appeal is denied."

La. R.S. 33:4727(E)(1) provides as follows:
Any person or persons jointly or severally aggrieved by any decision by the board of adjustment of any officer, department, board, or bureau of the municipality, may present to the district court of the parish or city in which the property affected is located a petition, duly verified, setting forth that the decision is illegal, in whole or in part, specifying the grounds of the illegality. The petition shall be presented to the court within thirty days after the filing of the decision in the office of the board.

Article 26 of the CZO "contains definitions for generic uses allowed in the zoning districts and general terms used throughout the Ordinance." Section 26.1 of the CZO. Furthermore, the following rules regarding the generic use definitions are set forth in Section 26.3 of the CZO, which provides:
A. Certain terms in this Article are defined to be inclusive of many uses in order to eliminate overly detailed lists of uses in the zoning districts established by this Ordinance. These terms are referred to as "generic uses."
B. A use that is not specifically listed in a zoning district, does not fall within a generic use definition as defined in this Article, or is not interpreted as part of a generic use is prohibited.
C. Any use specifically listed within any zoning district use table of this Ordinance or within the definitions cannot be considered part of a generic use definition.

The enumerated use standards set for restaurants set forth in Article 26.6 of the CZO are as follows:
1. During the performance of any musical accompaniment, all doors and windows in the restaurant shall remain closed. Any amplification used in support of a musical accompaniment shall be directed towards the patrons of the restaurant, and not toward any door, window or outdoor space.
2. No cover charge shall be charged for any performance of any musical accompaniment.
3. Full restaurant service shall continue during the performance of any musical accompaniment.
4. No more than ten percent (10%) of a restaurant's seating area may be dedicated to a staging area for any performance of musical accompaniment.
5. Aside from the portion of the restaurant seating area dedicated to the staging of the musical accompaniment, no restaurant seating may be removed or relocated during the performance in order to accommodate an audience and/or dance area.
6. Performance of the musical accompaniment shall not be permitted beyond 10:00 p.m. on Sundays through Wednesdays, or beyond midnight on Thursdays through Saturdays.
7. Musical accompaniment shall only be performed in the interior of a restaurant; outdoor musical accompaniment shall be subject to the general Live entertainment-secondary use regulations, as applicable.
Any musical accompaniment for patrons at a restaurant that is not in conformance with the above standards shall be included within the definition of Live entertainment-secondary use above, and shall be subject to the applicable regulations. Notwithstanding anything herein to the contrary, any musical accompaniment for patrons at a restaurant within any Vieux Carré District shall be included within the definition of Live entertainment-secondary use.

Section 12.2.A of CZO states:
Only those uses of land listed under Table 12-1: Permitted and Conditional Uses as permitted uses or conditional uses are allowed within the Historic Urban Neighborhood Districts. A "P" indicates that a use is permitted within that zoning district. A "C" indicates that a use is a conditional use in that zoning district and would require a conditional use approval as required in Section 4.3 (Conditional Use). No letter (i.e., a blank space) or the absence of the use from the table indicates that use is not permitted within that zoning district.
In Table 12-1, under the HU-B1A zoning district column, "Social club or lodge" has a "P"; "Live entertainment-secondary use" has no letter (i.e. a blank space); and "Live performance venue" is absent from the table. See Section 12.2.A (Table 12-1) of CZO. Thus, a social club is a permissible use; neither type of live entertainment use is permitted.

A cultural facility is defined in Section 26.6 of the CZO as follows:
A use that is open to the public and provides cultural services and facilities including, but not limited to, libraries, museums, aquariums, zoos, botanical gardens, and historical societies. A cultural facility may have ancillary retail uses, that offers items related to the facility for sale, and ancillary restaurants, which are only open during the hours of operation of the facility. A cultural facility may hold special events and receptions on-site, including events that take place after closing hours.

A "Reception facility" is defined in Section 26. 6 of the CZO as follows:
Reception facility . An establishment that functions as a hosting and rental facility or banquet hall for private events including, but not limited to, wedding receptions, holiday parties, and fundraisers, with food and beverages that are prepared and served on site or by a caterer to invited guests during intermittent dates and hours of operation. A reception facility is not operated as any kind of restaurant or bar with regular hours of operation. Live entertainment, excluding adult uses, may be included as an ancillary use of the private event and is not subject to a separate approval. Any business operating as a designated reception facility is not considered casual, temporary, or illegal due to the nature of the business operating intermittently for scheduled events with food and beverage service at the request of clients. Events scheduled by non-owners and/or operators shall be held a minimum of fifteen (15) times per year to uphold a legal operating status as a reception facility. (emphasis supplied).
Reception facilities are subject to the following use requirement set forth in Section 20.3 WW of the CZO:
1. A general admission fee or any other monetary donations (payment at the door to the general public) for entrance is prohibited, with the exception of fundraisers or events for bona fide non-profit organizations, places of worship or educational facilities.
2. All events shall be held within a completely enclosed building. Live entertainment, if permitted as part of scheduled events, is subject to a closed doors and windows policy and compliance with the City of New Orleans Noise Ordinance. Music of any kind is prohibited outside the building, unless approved through the conditional use process.
3. Outdoor lighting shall be directed away from adjacent residentially zoned property.
4. Hours of operation are restricted to 10:00 a.m. and 12:00 midnight Sunday through Thursday. Hours of operation are restricted to 10:00 a.m. and 4:00 a.m. Friday through Saturday.
5. A minimum distance of two-hundred (200) feet is required between any new reception facility and the nearest residential district.

Likewise, in the notice of the NPP meeting, Mr. Robinson states that "the right to live-entertainment for our membership's enjoyment has been challenged which means we are required to apply for approval [to the BZA]." Mr. Robinson states in this brief to this court that, "[b]ased upon Dr. Munster's [May 15, 2017] email, [he] was led to believe that Dr. Munster's position regarding his permit had changed in light of the elimination of the daily membership fee. But at the BZA hearing on June 12, 2017, Dr. Munster maintained his position that the permit application should be denied."

See also Carrere v. Orleans Club , 214 La. 303, 312-13, 37 So.2d 715, 719 (1948) (finding the exclusion inapplicable to an club "chiefly engaged in serving teas, luncheons, and dinners that are attended almost exclusively by members and their occasional guests").